251105 Catholic Charities of Jackson et al. v. Gretchen Whitmer et al. Arguments not to exceed 15 minutes per side. Mr. Goodrich for appellants. Good afternoon, your honor. May it please the court. Luke Goodrich on behalf of Catholic Charities and Emily Jones. I'll aim to reserve three minutes for rebuttal. Very well. Michigan's counseling law is subject to strict scrutiny under the free speech clause because it regulates voluntary conversations consisting entirely of spoken words, and it regulates those words based on their content and viewpoint. So if a counselor speaks words affirming a child's transgender identity and assisting that child with a gender transition, that is expressly permitted. But if a counselor speaks words helping a child realign her gender identity with her biological sex, that is prohibited. That is not only viewpoint discrimination, it is also harmful to children because it cuts them off from cautious counseling that many of them want to receive and pushes them toward medical interventions that cause lasting harms. So even if the child were to come in and specifically ask for help to that end, what you just described, to retaining, so to speak, a biological gender identity, that would be prescribed? Yes. The statute prohibits any practice that seeks to change an individual's gender identity. And the state's own brief in the back half of its opposition brief said it doesn't matter whose goals it is, whether it's the client's goals or the counselor's goal, any practice that seeks to change gender identity is prohibited. And practices that seek to assist a child to go through a gender transition are expressly permitted by the statute, and that's viewpoint discrimination. Subject to the Court's questions, I'd start with the District Court's core error here, which was misapplying Supreme Court precedent. Before you get into the merits, you very well know that Childs was argued a few weeks ago and the Supreme Court has taken up essentially the same issue. Maybe you can tell me if the main issue is different. And I'm curious your thoughts on whether it makes sense to wait for the Supreme Court or if we should raise the decision before them. Sure. We're asking this Court to decide in the ordinary course for three reasons, and I'll also give you a couple of precedents that back that. The first reason is the harm to the plaintiffs, ongoing irreparable harm. Status quo is you can't do this stuff. Exactly. Their speech is chilled right now, and every day that continues without a preliminary injunction, there are conversations they can't have with clients that they can never get back. Second is the harm to children and families throughout Michigan that want this sort of counseling. They're looking for it, and they can't get it because counselors are afraid to provide it, and this harms children and families in Michigan. The third reason not to wait is that this Court's decision can be helpful to the Supreme Court. The Supreme Court doesn't have all the answers. It often waits for issues to percolate in the lower courts because it can benefit from your reasoning in a case like this. Well, perhaps. I don't think I presumptively have that much to share with them always, but I'm curious about your harm points because it seems like you waited a really long time to sue, right? If we're thinking about every day or waiting a series of months for the Supreme Court to make a decision, it seems like the suit here was filed pretty much over a year after Whitmer selling this into law over five months before it went into effect. I forget how many briefing extensions you asked for. I'm kind of curious about the, we should speed up and go when that kind of idea of expedition wasn't on your part. We're not asking the Court to speed up. We're asking the Court to decide it in the ordinary course. As far as when it was filed, it was for example, they filed I think three years after Colorado's law went into effect. Not every counselor is watching what the legislature is doing all the time. But in the ordinary course, we hold a lot for the Supreme Court when the Supreme Court is granted cert and certainly once the Supreme Court has already argued something. I actually really had a hard time finding a case where the Supreme Court had already argued something and we didn't hold it. Maybe you have one of those you can share with me. A couple of examples that I think would be similar. One is Kentucky v. EPA. That was cited a couple of years ago. That was on venue for certain clean air acts. Judge Murphy wrote the opinion. And the Supreme Court had granted cert there. This Court didn't hold it. And the Supreme Court, Justice Thomas' opinion, repeatedly cited this Court's opinion because it was helpful. Half a dozen times cited Judge Murphy's opinion. Another example would be Memphis Center for Reproductive Health v. Slattery. That's an abortion case. And the Supreme Court had granted cert in Dobbs. Not a small case, right? Everybody knows that the Supreme Court is going to do something big on abortion in Dobbs. And yet after SCOTUS had granted cert, this Court moved forward with its decision there. And again, the majority in Dobbs cited the concurring opinion from this Court. So I don't think there's some, like, you have to stop because the Supreme Court grants cert and you haven't stopped in prior cases. And it's proved helpful to the Supreme Court. And I think it would prove helpful here. Even if you didn't all agree, the Supreme Court repeatedly allows percolation because it really benefits on what can be difficult issues. If there's no other questions on that, I'd move to the merits. I think the District Court's fundamental error was on speech versus conduct. And Cohen, Holder, and Nifla tell the Court how you decide whether a law primarily regulates speech or conduct. You look at what triggers coverage under the statute. And what triggers coverage under the statute is communicating a message, as it is here. That law regulates speech. And Nifla makes clear that that same analysis applies to professionals in the medical context. And Nifla went out of its way in rejecting the professional speech doctrine to criticize and abrogate the only two circuit court decisions at that point that were upholding laws like Michigan's. So I don't think there's any way to get around heightened scrutiny here. Some speech regulation is okay, though, right? So as a lawyer, I can't tell a client how to, you know, he comes to me and says, I want to commit a crime. And I can't say, oh, great, I had this client. He got away with it. Let me tell you about how to do it. I can't do that. I assume that the state couldn't allow, it would be okay if the state forbade a licensed therapist from telling a kid how to commit suicide. Why is that okay and this isn't? Correct. I mean, maybe, or maybe the others aren't okay, either, but. No, I love the hypotheticals. And I think there's two ways to kind of give you a remote roadmap for those. One is looking at the features of this law that make it unique. And the other is looking at the legal doctrines that give you off ramps from before you get to strict and unique. I'll just, one sentence on each of the five. One is it's regulating voluntary consensual conversations. Two is it's doing it based on a prophylactic prior restraint on those conversations, which is relevant to the analysis. Third is it's facially doing it on the basis of content and viewpoint, which is highly, highly relevant. Fourth is that it's regulating in an area of intense public debate. And the fifth is that it's imposing draconian, you know, threat of quarter million dollar penalties specifically designed to chill speech. That's what makes this law. Four and five seem different from my hypos, but one, two, and three seem the same. Like, when I used to be a lawyer, my speech was chilled. I couldn't tell my client, I could tell my client, don't commit crimes, but I couldn't tell them, here's how to do it. Is this, no, go ahead. Right? Sounds like. You had cooler clients than me. I didn't, yeah. Interesting practice. I didn't, it didn't actually, it's just a hyper, I used to teach criminal procedure.  Right, so speech incident or integral to criminal conduct is the exception that would allow a court not to have to get to strict scrutiny in that situation. And there are several other similar off-ramps, so it's speech incidental to conduct is one. NIFLA also recognizes the fact that they can mandate factual, non-controversial disclosures in the commercial context. A third off-ramp is if there's persuasive evidence of a long tradition of regulating speech in a particular way. Sure, I mean, you can't conspire, you can't commit fraud. That can all be done with words. It's itself a crime based on the content of the words, but it's been the case forever, so that stuff is not protected. Exactly, and then certainly content neutral regulations don't get heightened scrutiny as well. So if there was a content neutral regulation here, and maybe Michigan has one of these laws, I don't know, that says if a psychotherapist is violating the standard of care, they can lose their license. And somebody was to make complaints because a therapist was engaged in trying to encourage someone to change their sexual orientation, would the person have the First Amendment defense, and then that would just be reviewed under strict scrutiny? Yeah, it would depend. So are we talking about a malpractice action, for example, or just an ex-ante regulation, like you can't say certain things that... Well, I understand your prior restraint thing, but in general, I mean, even the First Amendment has been a defense to tort actions, to state law tort actions. So whether it was on the front end or the back end, still the state is prohibiting you from engaging in the exact type of speech that you're saying is protected here. Right, and it might be permissible. So if I can give you an example from two Supreme Courts, the National Federation for the Blind is one, and Illinois XRL Madigan versus Telemarketing Associates is the other. Both of those cases are about professional speech. It's licensed professional fundraisers. And in Riley, the state passes a prophylactic requirement that when you're engaged in fundraising conversations as a licensed professional, you have to disclose your average cut that you're taking from your fundraising solicitations. Supreme Court struck that down as unconstitutional, said that's broad, prophylactic, content-based, that's unlawful. Illinois XRL Madigan, the state, after the fact, after the fundraiser spoke, went after the fundraiser for a fraud prosecution based on specific misrepresentations that the fundraiser made. And the Supreme Court upheld that and said a tailored, after-the-fact fraud prosecution doesn't raise the same constitutional concerns as a prophylactic. And why wouldn't you think it would here in this case? And after the fact. I mean, it is still the same speech. I mean, and the state apparatus is still letting somebody lose their license or be sued for it. Yeah, so there's two possible off-ramps for this after-the-fact case. One would be on strict scrutiny. If you're going after the fact, if the plaintiff has an, if the counselor has an opportunity to argue about, you know, what is the standard of care? Was that actually breached or not? Was there any harm done? This law doesn't operate in that way. It sets, you know, the so-called standard of care ex-ante. Right, but in my hypothetical, that was the law just about a standard of care. That wouldn't have been the issue. If I understand the hypothetical correctly, one way it differs from this law is that the counselor could go in and say, I disagree with, you know, what the evidence shows on the standard of care. What I did met the standard of care and didn't impose any harm. Here, that's not the way the law operates. It ex-ante says you can't speak in this way. Right, it's setting the standard of care as opposed to allowing like tort law and the idea of what a reasonable psychotherapist would do. Right. Can I ask just... Let me, can I just... Yeah, please. Can I round that out? I mean, so you can have a law that facially regulates spoken words based on their conduct, like the one we have here, in your view. You can also have a law of general application where can you, let me put it that way, could you have a law of general application like, like, you know, psychotherapists can't violate the standard of care, that as applied to particular individuals would, in fact, based on the state's determination of what that standard of care is, as applied to particular therapists, would actually regulate them based on the content of their spoken words. Right. I think there still might be heightened scrutiny depending on how the law operated, but... Yeah, it's just as applied, not facial. Right, and the state would have a much stronger case for strict scrutiny to apply that after the fact to show, hey, there was actually harm done here, here's the harm, here's the causation. This law doesn't allow for any of that. Had I, there was in the briefing, I noticed a distinction between like just talk therapy and like so-called aversive methods, like slapping a rubber band or something like that. If Michigan had a law that just said, you know, essentially take the law here, but it's limited to the rubber band aversive method, you can't do that, or other types of methods, what level of scrutiny would we do that? Would we get that? That would get, I think that would get intermediate scrutiny because they're regulating the conduct of administering, you know... Why wouldn't it be rational basis? I mean, you know, it's like coercive. I mean, for some of this stuff, as I understand it, you know, if you're, I mean, there's some reference to shock therapy or, you know, hitting somebody with a rubber band, I don't know, you know, that's hypothetically, I'm not saying anybody does that. If the state proscribed that sort of thing, that's not speech, right? Right, just regulating the conduct of administering shocks or administering... Coercion. Yes. So that would be just rational basis? Yes. But if they're just like recommending that someone do it, like it's not a coercive therapy that you're like putting them in there and snapping the rubber band, but it's like someone is recommending in the course of treatment that, you know, every time you have a so-called intrusive thought, you snap a rubber band. You would say that would get intermediate scrutiny. Oh, well, okay. Well, so it might... I mean, presumably somebody is not like walking around and snapping the rubber band against them, so... Right, but like any other medical context where, you know, a physician is recommending, here's the course of treatment you should take. These are the drugs, take them this many times a day, take them with food, right? The state can regulate what a doctor says in that context because the doctor is also administering drugs and the state is regulating the conduct of administering the drugs and the speech when you take it... But the state like regulates doctors and dieticians and lots of people and even when they're not administering drugs or like doing therapy, doing like surgery and stuff. Like, you know, the doctor can tell you, you should exercise. The doctor can tell you, you shouldn't eat so much red meat. Like, the doctor can tell you a lot of things that are not connected to prescriptions and surgeries. And are you saying that none of that can be regulated? No, but I think it would depend on the context. I mean, in most contexts, the doctor is not just... You don't just talk to a doctor and there's no examination, there's no treatment. Well, the nutrition. Sorry? You're doing a telehealth call with a nutritionist, you want to lose some weight, right? And they give you advice about how to do that. Yeah. I think if the state was like prophylactically prescribing what you can and can't say in that conversation, you know, based on viewpoint, there might be heightened scrutiny there. But in most cases, in the medical context, it's not going to be just words. There's going to be some sort of examination, administration of treatment, things like that. There may also be, you know, the long history exception recognized in NIFLA may come into play there where, you know, if the state can show we've regulated doctors or nutritionists in this way, you know, as long as we've had nutritionists, that may be another path to reduce scrutiny. So, you know, I think there's plenty of tools in this toolkit for the court or the state not to get to strict scrutiny. And the state has all those tools here, you know, licensing, malpractice action. I guess I'm confused. So, like, you have to link, like, your diet advice to another type of medical procedure? Because, like, you could imagine in a psychotherapy context, too, that the psychotherapist gives you plenty of advice of physical things to do, right? Like, go try and date people of a different sex than you are, or try wearing these clothes, or, I mean, or try, you know, other things, and they're trying to maybe stop you from crying or hurting yourself or having panic attacks, right? So there's lots of physical nature connected with psychotherapy, and even, I think, you opened, you're opening with talking about this is about pushing to medical intervention or keeping people from medical intervention It's quite all over your brief. So it's a little weird for me to, like, I'm not sure where we're dividing up which speech in a medical context is protected, and the state can't say, yes, it's okay, and which speech you can't. Is it connected to, like, something physical, like some sort of physical medical treatment? Right. So where I would start to draw the line for that and for the court to answer the question is Cohen, Holder, and Nifla, where it says, what triggers coverage under the law? If what triggers coverage is communicating a message, we're in the speech realm. What triggers coverage under the law is some separately identifiable conduct that doesn't necessarily communicate a message. That's Cohen. That's conduct. Like, that's the starting principle. I mean, Judge Bloomcat's has a point. Like, what if I'm, like, a really effective way to lose weight is to just smoke cigarettes, right? This is why, you know, people in the 50s are skinny. They're smoking all the time, right? So, you know, let's say that the state's like, yeah, okay, that's really great advice for losing weight, but it's going to kill you. So they don't want the nutritionists to give that advice. I mean, it's just speech. Like, I advise you to go smoke some cigarettes and you'll take off all this weight and then your BMI will be less. Yeah, I think. Can they say that? Can they prophylactically say you may not advise cigarettes for weight reduction? I think at a minimum they could satisfy strict scrutiny with causation showing, you know, there's strong evidence. They have data and here they don't have data. So we could still be in strict scrutiny, but that now your point would be they would fail. Yes. So now, like, the dietitian, like, what doesn't get strict scrutiny in terms of just medical context? That is talking and communicating a message. I mean, can, if you have, like, an informed consent requirement, which is something you mentioned for convergent therapy, for this type of practice, your clients want to engage. Like, do you apply strict scrutiny to the informed consent requirement? No. And the off ramps from strict scrutiny, so the rubric, you know, every hypothetical, there's a rubric you can go through. One is, that one would be tradition. Is there a strong evidence? There's not a strong history and tradition of giving informed consent to, like, just speech, just, like, communicating a message. I mean, to the extent you're saying, like, this is just a voluntary communication of a message that's going on and not treatment and not, like, a medical type thing that the state could regulate, right, to the extent you're saying it's just expressive activity. Like, do we have a long history and tradition of needing informed consent to get expressive activity from somebody? Yeah. Well, two answers. One, I would, if you looked at the history of counseling and the regulation of counseling, I think you would see that informed consent to even to talk therapy arose, you know, right at the time when regulation of counseling arose. But the second answer would be, you know, if it is, if you're just, you know, the harder hypotheticals that you're posing are where there's speech and there's no conduct in the background, and maybe there would be heightened scrutiny there. But in the medical context, you know, the vast majority of cases, there is, there's conduct in the background or there's history that the state could point to or there's... How is there not conduct in the background here when you've connected it to medical intervention? And the whole idea is a cautious approach to medical intervention versus a more aggressive approach. So how is it not in the background? Right. What you're looking at is what triggers coverage under the statute. That's Cohen and Holder. And here the plaintiffs don't administer any treatment. There's no drugs. There's no surgeries. It's purely words. And in that context, you're... I mean, in cases like Casey or EMW in our court, I mean, it really is basically kind of, it is a type of compelled speech that the statute requires on the part of the physicians. But it requires it as a conditioned precedent in order to engage in those instances in a surgical procedure or an abortion. So it's, I mean, the connection to non-speech, the words themselves don't generate the regulation it's the desire to engage in a surgical procedure that in turn requires certain speech. It's different in a couple of, in those two ways. It's compelled and also it's a conditioned precedent to lawfully performing a procedure. And I mean, I don't know. I mean, that is, well, you have anything to add? I mean, that's just kind of, I mean, we're just talking about this. So that's the speech incidental conduct that NIFLA recognized. But then isn't the treatment that the psychotherapist giving the procedure in this analogy, if we're talking about like speech, it's okay to regulate the speech, the informed consent incident to a medical procedure, right? And you're telling me it's fine to do informed consent for this. So it's only can be fine to do informed consent for this if there's some sort of medical treatment or medical procedure going on, right? I mean, you couldn't, you couldn't like require informed consent to like, you know, give a listen to somebody in the town square, right? So, so obviously, I mean, and it's all over your, your client's affidavits that they are treating people, right? This is a clinical practice, right? That's, that's your client's words, right? So there is some level of, of medical procedure or medical thing going on to, to use Judge Kavlage's analogy, right? With the abortion context. I was talking about surgical procedures rather than words being speech in that hypo. Right, whether you, what you're labeling treatment here consists entirely and exclusively of spoken words. And so, you know, like in Cohen, the statute prohibits breach of the peace, and you can breach the peace through all sorts of conduct, destroying things, things like that, and it doesn't trigger strict scrutiny. But when what triggers the breach of the peace statute is wearing a communicative message on your shirt, that gets you strict scrutiny because there's no separately identifiable conduct that triggered the statute other than the communication of the message. And that's what we have here, whether you label it treatment or not, there's no separately identifiable conduct other than the words that come from the counselor's mouths. And that's, that's speech. Do you want to say just a word about vagueness? Because it, it seems to me that, you know, maybe this line is difficult, but I find it difficult to understand what's prescribed by the statute. And the, the district court in your, in the state, both say it's the statute's not vague, but for different reasons. The district court says it's not vague because your client's speech is clearly prescribed, and the state says, well, it's not prescribed at all, and therefore it's not vague. And so that suggests to me that nobody knows what statute really regulates. Do you want to speak to that? Our position is the, the plaintiff's speech is prescribed by the statute, and it's vague, so. Right, and there's a third. With both of them. But, you know, the text of the statute prohibits any practice that seeks to change gender identity. And it's, or gender expression, or including behavior, things like that. It broadens it out with the including clause. Even before you get to the including clause, though, you know, the state's narrowest possible interpretation of the statute, it seeks to change gender identity is prohibited. And you look at record page 244, the McJones Declaration, says that if a client comes and seeks to change gender identity, she will provide counseling that seeks to change gender identity. So even under the. So you say it's, it is prescribed. So then it's not vague. Well, seeks to change gender identity is not the only thing that it prescribes. The statute is written much more broadly than that, with some very vague terms, you know, including efforts to change behavior or gender expression, and so forth. Right, that including clause renders it much broader. And then, you know, there's all, you know, it carves out facilitating identity exploration. So, like, what's the difference between identity development that's permitted and identity change that's not? And the bottom line is state, the state board here has tremendous discretion because of this language to choose who to go after and who not to go after. And it has in its pocket quarter million dollar fines and the loss of a license that it can impose. And that's why this is so chilling on counselors throughout the state of Michigan and why they can't have open conversations. All right, let's hear from the state of, from the Attorney General's office at least here. It's the, who is your client here? It's the governor. All right, go ahead. Thank you, your honors. May it please the court. Assistant Attorney General Christopher Braverman on behalf of the state of Michigan at Belize. I would like to begin, if I may, to address the child's question. That is something that we as the state have requested already to this court that in this case, there should not be any further action taken until we have the Supreme Court. That, okay, so let me tell you my concerns about that. Number one, they're arguing that the status quo is contrary to the Constitution, the status quo as we sit here. Number two, Congress has granted us jurisdiction in this interlocutory appeal, which is by its nature time sensitive. It concerns what the status quo should be during the pendency of this litigation. Congress has told us we should adjudicate that. And the Supreme Court, I mean, for all we know, they might decide the case in June. And meanwhile, the Supreme Court in Colorado River says we have a fairly strict duty to exercise the jurisdiction to decide the rights of the parties in front of us when they have appeared in front of us. So how would we just sit on our hands for potentially six or seven months here in this time sensitive interlocutory appeal? Sure. And Your Honor, I certainly don't mean to suggest that the court can't proceed in its usual course and decide this case. Only that under the circumstances here where we have a law that has been in effect for nearly two years, it was enacted very expressly to try to protect a vulnerable group of population from demonstrable harms. And while this case is pending with the district court's decision, that law remains in effect. Right. That's the problem in their view. And they think that's a constitutional problem. And we do know that Colorado's law is essentially identical to Michigan's. And the central issue in that case is likely, we don't know, of course, what the Supreme Court is going to do if it will find another pathway to decide that case. But there is a very good chance that it will decide the controlling legal issue. And it very likely will. But in an interlocutory appeal, preliminary injunction appeal, just by its nature, weeks and months count. They're material. And I just don't hear any basis on which, given Congress's grant of jurisdiction, our duty to exercise it, the time sensitive nature of the appeal. I agree with everything you just said in terms of it's upstairs. And they are going to decide it. I don't see how we could just choose not to discharge our duty here. Sure. And I don't think we are going to press this issue so far as to suggest that you can't or that you don't have the ability. Only that in this instance and under these circumstances, we think it would be appropriate so that the court, the parties, can have the benefit of fully reviewing that decision and determining its impact. The Supreme Court might say it's the other way around. And I don't see that really as a compelling reason for us to act. But they do wait, typically, until they have the benefit of multiple circuit court opinions. And an additional one would presumably, for that reason, be beneficial to them. I mean, that's truly, that's kind of a marginal point here. I mean, it's just, we have a duty when we have jurisdiction. Absent an extremely good reason not to do it. Anyway. Is Michigan presently enforcing the law? Like if a complaint came up about some therapy that was done tomorrow and you got a complaint in a month or so, Michigan's enforcing the law. They would enforce it the way they have been for basically the entire existence of their professional licensing regulatory scheme. So there's a very multi-factor, multi-step process that if a complaint is received by the licensing body, it goes to a review panel. If an investigation is authorized, then an investigation takes place. If, as the result of an investigation, there is indication that a violation of the applicable standards may have occurred, then potentially formal licensing action can be brought. Well, you know, multi-factor tests and so on, you know, be those as they may. I mean, the statute here pretty clearly tells these folks they can't do what they want to do. And I mean, it's part of what makes the laws of this country good is that the statutes give you a pretty good idea of the boundary between lawful and unlawful conduct. You don't have to wait for the executive to come in and say, yeah, it means what it says. And I mean, don't they have good reason to think that if a client comes in, let's say a biological male, 14 years old, who says he's confused about this stuff and wants help remaining as someone who identifies as male. I mean, are they just, is this a baseless concern on their point, that the therapist could lose his license if he provides the service that this young person is asking for? I think that if you don't get to the first part of the statute, which is a practice or treatment that seeks to change an individual's sexual orientation or gender identity, then the concern would be baseless. That if they're not engaged in that level of treatment and they don't meet that first part. What does that mean? So if change implies there's something from a baseline, whose baseline are we looking at? So let's say a teenage boy comes in, he says, I'm gay and I want to change. I want to stop being attracted to boys. I think you would say that violates the statute. If the licensed mental health professional agreed to provide that treatment. Oh yeah, and the professional says, yes, I will help you with that. But what if he comes in and he says, I'm not sure, but I'm not sure whether I'm gay. I feel like I'm attracted to boys. I would like to stop that. Now can the therapist say, I'm going to help you stop having those feelings? Because he's not sure he's gay, so there's nothing to change? I just am confused. Or what if he comes in and he says, I identify as straight, but sometimes I have feelings of being attracted to boys. I want to stop those. Can you help me? Well, now I guess there's nothing to change because he said, I mean, I don't know what the baseline is. Is it what the client expresses? Is it what the therapist perceives? Is it what society would perceive? So those are really interesting and good hypotheticals. And I think what might be helpful in answering that is to say what we believe is the clear dividing line in the statute between permissible and prohibited conduct by the licensed mental health professional, which is when change is the object of the treatment and that change is to the individual's sexual orientation or gender identity versus the open-ended facilitating exploration and change not being prohibited as an outcome. It just can't be the object. So in the course of an open-ended therapy counseling relationship, some change may occur and the state recognizes that. I think the normal understanding of mental health counseling would recognize that. The key is when that change happens naturally and is open-ended and not the object of the treatment. So in my three hypotheticals, which of those are forbidden? I'm not sure that in those hypotheticals that you gave, changing an individual's gender identity or sexual orientation was the object of the treatment. Well, you're just changing their, I think it's changing a treatment. Attraction is forbidden by the statute. So if the boy comes in, he's a teenager, I am gay, I am attracted to men, I want to stop being attracted to men. Can you help me? Therapist says yes. I think you've violated. I'm not sure whether I'm gay. Sometimes I'm attracted to men. I would like to stop being attracted to men. Can you help me? Or I am straight, but sometimes I am attracted to men. It seems like, I just don't know what the baseline is. Is it how the client identifies? What do we mean by change? Change from what? Ideas of his sexual orientation or gender identity, which is a different category. Yes, I think that is the starting point, is the client's, minor client's sexual orientation or gender identity. But the statute goes out of its way to make it clear that the open-ended exploration type of counseling is prohibited. Let's talk about permitted. He's saying that they have clients who come in and say, we don't want the open-ended thing. I want to help remain, I think I'm a girl right now, a client might say. But I'm a biological male and that's the way I want to identify. Please help me identify that way. They can't provide those services. That is correct. Now if somebody said, if that same individual who is a biological male, but presents as I think I'm a female. If he instead says, can you help me, kind of, where is it here, kind of, you know, undergo this transition, then they can provide, then the therapist can provide that help, correct? Yes, because it is not by definition conversion therapy. Okay, but I think we have to move soon here to the First Amendment rather than, you know, the anatomy of this thing. I mean, I get what you're saying, but you can't evade First Amendment scrutiny simply by saying, this thing regulates conversion therapy and these words assist conversion therapy and these words don't. Or these words are transition therapy, is one way to put it, and those are permissible. But that's conversion therapy, so that's not permissible. That is a fair assessment of at least part of what this does. Is that fair? Well, if you are just looking at the part of the definition that says what is not conversion therapy. Right, let's just set aside the exploring part. It says transition therapy is fine, conversion therapy, you can't talk about that or you lose your license. Is that fair? Yeah, so the language is that it does not include counseling that provides assistance. I know the language. Is that a fair description, you know, of what we're talking about here? Yes, that second part would be permissible under Michigan's. So on its face then, it is viewpoint discriminatory. If you're talking in the direction toward transition, that's okay. If it's in the direction, the other direction, it's not okay. And so, I mean, it just seems to me that this, on its face, is just clearly viewpoint discrimination. And so the question here, to use your friend's terminology, is whether you have an off-ramp. I mean, just to kind of clarify the case, is that fair? So I would say, in terms of what the question is here, absolutely the state does not accept that this would be viewpoint discrimination. And the reason why, for First Amendment purposes, is if you take a step back and look at what is this form of mental health treatment, this is a specific type of treatment under the auspices of Michigan's public health code and regulation. Hang on for a second, because you're getting to the off-ramp, all right? I'm just talking about the words people can speak. Let's just look at this in a more abstract sense, not in the context. The medical stuff is relevant, and you have an important argument to make. But I'm talking right now just about the words. And they can say words with certain content, and it's fine, but words with kind of the opposite content, you lose your license. And those, I mean, that's viewpoint, that's content-based. So I would still go back to this distinction, that if those words were being spoken in the town square, yes, in the context of a couple of years ago. Can you answer my question, okay? That this provision, as applied to these plaintiffs, these therapists, which says if you speak these words, you're fine. If you speak the opposite words, you lose your license. That proscription in this provision, setting aside the exploring part, that is making a distinction based on viewpoint and conduct, correct? I still do not agree with that, Your Honor, because the licensed mental health professional engaged in a counseling relationship is providing treatment. That's not my, you're not answering my question, okay? I'm not talking about treatment, I'm just talking about words. You don't have to answer it. I mean, I guess you're not answering it. It seems to me Orwellian to say that this is not making a distinction based on the content of what the therapist says. And that might be okay if you can get to an off-ramp. And I'm just trying to clean up the case in terms of what's really in dispute here. Sure. And I think this is perhaps one of the key things in dispute, which is the spoken words that the therapists are saying in the counseling sessions. And this is backed up by the national professional associations for these professions. American Psychological Association filed an amicus brief in this case. They said being gay was a behavioral disorder in the DS probably three, four? Sure, but just in describing what is talk therapy, if we just focus on that, what they say is this is not just speech like any other speech. This is, it misapprehends the nature of therapeutic intervention, all of that. But okay. I mean, this really goes to whether there's an off-ramp. We're not, we're not, the American Psychological whatever association does not tell us what is speech for purposes of the First Amendment. Now, I mean, it can say, I mean, if you come in here with something akin to, you know, smoking causes cancer and here's the evidence, you know, on that order that's, you know, then you could survive strict scrutiny. But I mean, just because the therapist, you know, a certain body of therapists at a certain point in time says that, you know, these words have a certain effect, it doesn't mean they're not speech for purposes of the First Amendment, right? Well, I think, again, if we go back to Casey, NIFLA, EMW, it is fair to describe spoken words in the context of the practice of medicine, conduct, the speech conduct analysis. Which is often an illusory distinction. I mean, wearing an armband is an act, but it's expressive. It's treated as speech. You know, saying, go out and sell this ounce of methamphetamine, those are words, but it's not treated as speech. And we could imagine situations, too, where particular medical procedures could be expressive, right, for a particular doctor, could express their views. If you think, like, family and having children is very important, then, like, providing fertility treatments and even providing them maybe beyond what a standard of care is could be an expressive activity for that person. Now, I'm not saying that the state couldn't regulate it just because it's expressive, but just to underscore the point that sometimes it's hard to figure out, you know, with expressive activity can sometimes be conduct and speech can sometimes be treatment. Yeah, I think sometimes plastic surgeons just will describe themselves as artists. I mean, I'm not kidding. Yeah, that they're making something beautiful with a face. And if we go back for First Amendment purposes. Surely that could be regulated. I think under that example, yes, because according to Casey, according to NIFLA, according to EMW from this court, when it is being regulated as part of the practice of medicine, it's subject to the state's licensing regulatory power. That is where they have said rational basis applies, and this is speech incident. So if talk therapy is treatment, the same words could be uttered by a non-licensed therapist and the state wouldn't regulate it, right? So why are those people not engaged in the practice of medicine? It's just, they're just saying, they could say the exact same words. And so if it is treatment, why can unlicensed people do it under your regime? Well I think what the Michigan's law reflects is essentially a recognition of the limitation of reaching beyond the scope of licensing the medical health professions. So it intentionally chose to focus this law only on those professions where the licensees have obtained the necessary education and training and expertise to engage in those professions. So it's recognition that it's not trying to go beyond the scope of what it traditionally has done. Now could there be a circumstance where evidence is brought about somebody who has gone so far as to essentially engage in the practice of one of those professions? Perhaps. I mean we don't have anything on the record to reflect that. But it does make the law a little bit under-inclusive if the idea is that people speaking these sorts of words causes harm to children, and yet it's only licensed therapists who can't speak the words. Well they can speak the words, they just can't do it in a clinical setting, right? They can advocate for it and advocate for these treatments just outside of the clinical setting. Correct. Is that right? So is it like, one of my girlfriends could tell me, you know, Judge Bloomcatch you should smoke some cigarettes and lose that last 10 pounds, like, but a dietician couldn't do that. Like we make that distinction between what medical professionals can tell you and what friends or just people in the public can tell you. I think that's fair. And if that friend was going so far as to essentially act as a licensed dietician and getting clients and talking to them and giving them advice without having a license... Charging me for it, charging my insurance. Right, perhaps that would be enough. I think at one point in this litigation, and forgive me if I'm wrong, the state took the position that if the counseling was client-directed, that is the client asked for it, then there would be no liability. But I think your brief disclaims that. Is that correct? That is essentially correct. In our brief to this court, and if there was confusion with maybe the way that it was explained in the lower court, I think some of that comes from the vagueness of potentially what plaintiffs described as their own forms of therapy, but also getting really at the core is the idea that as long as it's open-ended and not seeking to change with change as the object of the treatment, then that's where the line is. But yes, I think that's an accurate way of describing the state's position right now. Yeah, so part of what I... I'm not trying to give you a hard time here today. Part of what I try to do sometimes, and frankly when I was in front of a podium, I had judges do this and I appreciate it, is like the judge will tell you, here's my problem with your argument. And so with the argument, I mean, it seems to me your strongest argument is about the regulation of the medical profession. And there is, at a certain level of generality, there is a long tradition for that. But I'm not aware of an example of a medical regulation that was triggered where the obligation either to speak or to refrain from speech was triggered by the regulation's terms based on the content of those words. Do you have any examples of that in the tradition of state regulation of medical procedures? I mean, Casey, the abortion, frankly, compelled speech, that obligation doesn't arise from somebody speaking words. It arises from someone wanting to have a surgical procedure. So is there... I mean, your friend on the other side really emphasizes that the proscription here is specifically pegged to the content of words that someone is speaking. Is there another example of that in the medical regulation context? As far as Michigan's history, Your Honor, I'm not aware of any. Certainly, if we look nationally, this specific type of regulation is being addressed by numerous courts. Other circuits have reached it. Other circuits... I mean, some states have this kind of restriction, and many states don't. Isn't that just as good a reason for courts not to assume that we can just mandate one or the other on the unconstitutional grounds? I mean, doesn't that give us... shouldn't that give us skepticism rather than say, oh, some courts have said this is fine. Let's... well, I don't know. Maybe that doesn't make sense. You just want your law to stand, so that's okay. Strike the question. I'm sorry. Yeah. That's right. Good answer, counsel. Okay. So here's the other thing, though. I mean, you are treating this at a pretty high level of generality in saying that there is this long tradition of state regulation of sort of medical treatment, let's say, okay? And that, to me, seems akin to describing the regulation, the statute in the Holder case. It was that terrorism case. I mean, that would be like the government in Holder coming in and saying, well, we have a strong tradition of prescribing activities supporting terrorism. We can regulate terrorism, so to speak. And lo and behold, kind of buried in that provision, or that statute, was a provision that says you can't instruct these people about political advocacy. And the Supreme Court said, well, wait a minute. Now you're talking about words, and the words that you can speak to these, I don't know who the audience exactly was there. And so the court drew the line and said, even though obviously the government can do tons of stuff to prevent terrorism, it can't trigger a proscription based on political words you're going to say to somebody. That's fair, Your Honor. And if NIFLA hadn't been decided after Holder, we would certainly be in a different context, or having different Supreme Court precedent to argue. I do think Holder has to be squared with NIFLA, because NIFLA... Okay, so how would NIFLA change what the court did in Holder? Well, because NIFLA was presented with and addressed the very specific topic of regulation of medical professionals' conduct with incidental impact on speech. Didn't they say you couldn't do it there? Right, because what they found was it was unrelated to any procedure. So that's why it didn't meet muster. It was lawyers in Holder. It was professional speech there, too. And I think what is interesting about NIFLA is that when they were talking about the holding in Casey, which also involved that informed consent and compelled speech in the physician-patient relationship, the state sort of intruding upon what doctors and patients can talk about and say in the course of treatment, was that because it was the practice of medicine, NIFLA went out of its way to emphasize the word practice, that when the regulation is part of the practice of medicine, it's subject to the reasonable licensing and regulatory powers of the state. Do you think that's the strongest case for you? I mean, I'm not trying to limit your... Well, didn't NIFLA specifically criticize two... I mean, if NIFLA's your strongest case, I mean, NIFLA went out of its way to criticize two circuit courts that upheld conversion therapy bans. Well, right. And that's fair, Your Honor. And I think the context of that criticism, though, was rejecting the idea that professional speech by itself is its own category that's subject to lesser restriction. We have not taken that position. The district court did not rely on that for reaching its holding. Right, but it just said it's not speech at all. It's just conduct. Is that still the line you're promoting? Like the district court was right because this is conduct, not speech? No. This is... The law, Michigan's law, targets professional conduct with, to the extent there is an impact, only an incidental impact on the speech of the licensed professionals. On their personal expression. Right. Because in the clinical therapeutic setting, the therapist is not expressing personal viewpoints. They are providing a form of medical treatment. And it goes back to that sticking point of, in these sessions, when they are administering talk therapy or any other kind of psychotherapy that they are trained and able to do as part of their license, their role is not as expressing personal viewpoints. It is treating a patient. Isn't that exactly what NIFLA said is not the way we analyze professional speech? NIFLA's core premise seemed to be that professionals are expressing their own viewpoint in doing their professional work. And so we're not going to just say, oh, that speech done by a professional, a medical professional, and therefore there's no protected content in that. I thought NIFLA said the exact opposite. So NIFLA did say that professional speech by itself, if you were just to say, we are regulating this and it's subject to lower scrutiny only because it's professional speech. Regardless of the profession, regardless of the speech, does not... I think it said speech by professionals. And this is like words coming out of the mouths out of professionals. Right. And so what we get, though, is still not quite to the issue in NIFLA of an actual regulation on a licensed health professional in the form of treatment that the state is telling them is prohibited or permissible. Right. I mean, we're kind of talking around each other because this is... the statute is based on the words you say. It's not... I mean, we're just elevating levels of generality to now it's regulating treatment. No, it's regulating the words you say and not just based on the topic, but what point of view you have for that topic. And as a general matter, the First Amendment has a really big problem with that because we're ultimately prescribing what people can think. You can't hear this opinion and so we're going to stop you from hearing that opinion. And you have an argument that this is a medical setting, but you don't have a precedent of the state regulating the words that, you know, anybody, any medical person says based on the content of those words. And it's just that you've got real headwinds with the First Amendment here. It does seem like a little bit of a Sue Giner's area when you're dealing with, like, just talk therapy, right? Like you could think of other types of even medical procedures that maybe people find also, like, have First Amendment value, have expressive value to them. But it's very easy to say, like, okay, well, even if providing fertility treatment to someone has expressive value, right, and it's my expression, it's easier for the state to say, it's a little more segregable to use the word we used earlier today. It's easier to separate out, well, you're giving somebody these hormones, right? So in guise of who you can give hormones, we're going to incidentally suppress your viewpoint, right, your expression. My understanding of your argument, and you can correct me if I'm wrong, is to say, like, well here, yes, you understand that the therapist does have a viewpoint, just like the fertility doctor had a viewpoint. But what they are doing in their actual practice is akin to a medical procedure, right? They're using their, you know, hours and hours of training and their years of schooling to figure out how to change people's behaviors, right? And to the extent that their viewpoint gets suppressed in the state trying to regulate the actual therapy practice, that's what's incidental. That is correct, Your Honor. And again, if you go back to the definitions of each of these professions under Michigan's public health code, all of them, as a function of being a member of that profession, includes providing treatment for mental health disorders. That's baked into what that profession is. Okay. Well, you've been a trooper up here, ain't you? And I see my time is up. You've done an admirable job of representing your client here today. So thank you for your argument, Mr. Braverman, and we'll hear a rebuttal. Thank you, Your Honor. Thank you, Your Honor. Why don't you pick up on that last point about, well, you know, I think NIFLA really does answer this last point. I mean, NIFLA is the medical context and NIFLA talks about labeling. And I understand, you know, you can call it treatment because it is in a medical context, but the labels aren't dispositive. You look at what triggers coverage and what triggers coverage is the words. You know, just like Holder and just like Cohen, you know, breach of the peace, you know, it's clearly, it's a law targeted at conduct. My friend said on the other side, it's targeted at conduct in Cohen as breach of the peace. But when what triggers the statute is the words, then it's not, you're no longer regulating just the conduct and the speeches. So is your argument, too, that in this medical context that somehow talk therapy is sui generis because it doesn't involve some sort of, you know, traditional physical conduct that it just involves words? Because like, go back to my fertility example, you know, like you could have all sorts of expressive activities that are physical for lack of a better way to describe it, right? But there you wouldn't say like, oh, that's strict scrutiny, your regulation of, you know, this fertility doctor, you wouldn't say strict scrutiny, you would say, well, any, you know, burden or any quashing of that doctor's expressive activity is incidental to us regulating, you know, the provision of hormones. So does this problem that we're talking about only come up in talk therapy? It's, I mean, you mentioned dieticians earlier. I mean, there may be a few other limited contexts where all the person, all the professional does is words, and the state tries to relabel those words as conduct. I think that's where it would come up. And the, but the reason that's the line. So unless there's a historical analog, like maybe informed consent, like, are all regulations of talk therapy subject to strict scrutiny? Well, because it's just words, Right. So licensing, there's all kinds of regulations of talk therapy that aren't necessarily content based. Take like a licensing restriction on talk therapy. You must have X number of hours of training before you engage in talk therapy. That's not content based, that's permissible. But if we like, if like it were, if like a particular type of therapy, you know, for birth psychology, I have little kids, so I know a lot about it. You know, if we banned that, I don't know if it's accepted medical practice, but work with my hypothetical, right? Like strict scrutiny. Yes, when it's only words, exclusively words. So like a particular like practice. So if it were like widespread, under widespread past practice that when people are anorexic, you should body shame them, tell them they are too skinny, they have to gain weight and things like that. And then evidence shows these people are becoming more depressed and committing suicide. If the state wants to say no practice of body shaming for anorexia clients, then that's got to, that's strict scrutiny. I think that would probably satisfy strict scrutiny there. Well, depending on how many, what if there aren't that many studies? I think if you're, if you're directly telling the patient, here, do something that harms your body. No, no. They're telling them to eat. You're too skinny. It's an anorexic patient. They're telling, no, eat. You're too skinny. You look awful. You're too skinny. Eat, eat, eat. But really, because of the psychology of how anorexia works, that's making the person feel worse and get more, more depressed. And a lot of anorexia is about control and feel less in control. And now we're having these teenage girls commit suicide. Right. That's, and if the state wants to say no more, I mean, you're not telling somebody to hurt themselves. You're not telling them to starve themselves. You're telling them to eat. If the state can show direct. But that's strict scrutiny. If it's regulating the words that come from someone's mouth based on the content and the viewpoint of those words. Yes. And that's because we have a free speech clause. We don't have a free drug administration clause or free scalpel clause. But when it's just words that that's in free speech land. And sometimes a free speech clause imposes costs. People say things that hurt people's feelings or maybe even give bad advice sometimes. But here, I think we've established that what's issue is, is words. And these are words that children and families across Michigan want to hear. They're words that can spare children a lifetime of surgery and harm. And they're words protected by the First Amendment. So we'd ask you to reverse, please. All right. Again, we thank you both for your arguments and your good nature at the podium. The case to be submitted.